## Case No. 8,409.

### The LIVE YANKEE.

[Deady. 420.] [1]

### District Court, D. Oregon. June 20, 1868.

#### CARRIERS—DANGERS OF NAVIGATION—BURDEN OF PROOF.

A common carrier gave a receipt for two casks of wine, received in good order, and agreed to deliver them in like condition at the end of the voyage, the dangers of navigation excepted; in a suit by the shipper for the non-delivery of the goods, the carrier claimed that the wine was lost on the voyage on account of the dangers of navigation and insufficiency of the casks; *Held*, that the burden of proof is upon the carrier to show that the loss arose from the insufficiency of the casks or the dangers of navigation; and that, if upon the whole proof it was doubtful whether the loss arose from either of such causes, the shipper must recover.

[Cited in The Oriflamme, Case No. 10,571.]

In admiralty.

Eugene Cronen, for libellants.

Erasmus D. Shattuck, for respondents.

DEADY, District Judge. On April 20, 1868, Levi Millard and William J. Van Schuyver, merchants and partners in the city of Portland, filed their libel against the barque Live Yankee, then lying in the port of Portland on Wallamet. The libel alleges that the libellants on or about October 1, 1867, shipped on the Live Yankee, at the port of San Francisco, California, and bound for the port of Portland, among other goods, two ¾ casks of wine, in good order and condition, to the libellants, the damages of fire and navigation excepted; primage, etc. That the Live Yankee soon after sailed for Portland, at which port she arrived about November 1, 1867, and that by reason of the improper stowage of the casks and the negligence of the master and crew concerning the transportation of the same, they were wholly lost and destroyed, to the damage of the libellants $217. By the answer of the respondents, John Wiggin, master, and A. S. Abernethy, intervening for their interest in the barque, the voyage in question is admitted to have been made between October 4 and November 5, 1867, and that the libellants shipped thereon, among other goods, etc., two ¾ casks of port wine, as alleged in the libel; and as to the order and condition of such casks at the time

---

[1] [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

of shipment, the respondents say that they have no knowledge, but allege upon information that there were secret defects in the casks, not observed when received on board, and which could not have been observed or remedied after they were stowed, and that the value of the goods did not exceed $100. The answer also denies that the casks were carelessly or negligently handled or stowed, and alleges that the loss of the wine was owing to secret defects in the casks and the perils of navigation.

On the trial the libellants read in evidence a freight receipt as follows: "San Francisco, October 2, 1867.—Received from P. C. Dart, 419 Front street, in good order, on board the barque Live Yankee, for Portland, Oregon, (the damages of fire and navigation excepted,) the following packages, marked M. & V." Then follows a list of the goods shipped by the libellants, including the ¾ casks of wine. It being admitted by the answer that the casks of wine were received on board the barque, to be delivered to the libellants at Portland, and also that such delivery was not made, the barque is prima facie liable for the value of the goods. In addition to this, it appears from the freight receipt that the casks were in good order when received by the master. This being so, the burden of proof is upon the respondents, to show that the loss occurred, as they allege, from secret defects in the casks, or the perils of navigation. Seller v. The Pacific [Case No. 12,644]. As to the latter defence, the evidence fails altogether. True, as appears from the testimony of the master, the voyage was a long and stormy one, yet so far as he is able to testify no water went down the hatches, nor did any portion of the cargo shift from its position. At Astoria the master procured a survey of the hatches, and at Portland of the cargo. Gilman, an experienced seaman, and now and then a Columbia river pilot, was one of the persons who made these surveys. He testifies that no water passed down the hatches, and that no part of the cargo had shifted its position. There is no other evidence upon this point. Under the circumstances, to attribute the leakage of the casks to the perils of the sea, would be a mere arbitrary assumption unsupported by proof. It is not enough to show that the vessel encountered adverse winds and heavy weather, and therefore the loss might have been caused by these elements. The loss of the wine being admitted, if the respondents claim that it was occasioned by the dangers of navigation. the burden of proof is upon them to show it. This fact must be established with reasonable certainty, and not rest upon mere conjecture or possibility. If upon the whole it is doubtful whether the loss arose from the perils of the sea, or the negligence or want of skill in stowing the cargo or navigating the vessel, the vessel must bear the loss.

Counsel for the respondent maintains that if it is doubtful how the loss occurred there can be no recovery—that the vessel is exonerated; and cites Clark v. Barnwell, 12 How. [53 U. S.] 280. But I do not so read this authority. The court say in effect (page 283) that the proof was clear that the damage was occasioned by one of the dangers of navigation, and while it was competent for the libellants to show that it might have been prevented by proper skill and diligence on the part of the respondents, unless such proof was made, the law would presume that the damage occurred without negligence or fault on the part of the master or owners. The case cited clearly establishes the doctrine, that if it be first admitted or shown that the loss was occasioned by a peril of the sea, and upon the proof it be doubtful whether such peril could have been avoided by proper skill and diligence, and the loss thereby prevented, such doubt is to be resolved in favor of the vessel, for in that stage and posture of the case, the law shifts the burden of proof to the libellants, who must establish the negligence or unskillfulness of the respondents, before they can recover. But in the case before the court it is not admitted that the loss was occasioned by a peril of the sea. On the contrary this is the question in dispute and the burden of proof is upon the respondents. who have the affirmative of it. Then if upon the proof it be doubtful whether the loss was occasioned by a peril of the sea, that doubt must be resolved in favor of the libellants, for the burden is upon the respondents to establish that fact.

As to the question of whether the loss arose from the insufficiency of the casks or not, the case is not so clear. The master testifies that the casks were well stowed and dunnaged, with bungs up and bilge free. To the same effect is the testimony of Gilman. In one particular, however, there is a marked difference in the testimony of these two witnesses. The master states that these casks, with the others belonging to the libellants, were stowed on the bottom of the vessel, one tier deep, on one side of the kelson, and then covered with salt in sacks. Gilman states that the casks in controversy were stowed in the middle tier of three tiers of liquor casks; that the top tier was barrels of whisky, and that there was no salt upon them, but some light boxes of dry goods. It is not necessary to conclude that either of these witnesses made an intentional misstatement about this matter, but both their statements in this respect cannot be true. One of them at least must be mistaken about the stowage and position of this part of the cargo. But this flat contradiction in the testimony of the respondents' witnesses must be taken into account in estimating the value of their testimony. The observation or memory of one of them, and the circumstances do not disclose which of them, is much at fault

and unreliable. The casks have been brought into court. They will hold about thirty gallons each—are made of oak and hooped with wooden and iron hoops. The witnesses say they are French wine casks, or very good imitations of them. The stains and rust upon the exterior indicate that the casks are old, but no particular marks or appearances of decay can be seen. One of them is altogether empty, while in the other there is probably ten or twelve gallons. The chine-hoop is off one end of the empty barrel and a small piece of the chine broken off. From all the testimony I conclude that the casks are now in the same condition substantially as when they came out of the hold of the vessel. One witness testified that when the casks were placed upon the wharf, the bilge appeared to be pressed in, as if it had been subjected to a heavy pressure. The casks at this time have no such appearance, and I think the witness must have been mistaken in this particular.

Francis E. Hoag testifies that he was drayman for libellants when the wine arrived. That he saw these casks on the wharf and refused to take them because in bad order. "Both of them appeared to be jammed in the head and the liquor ran out of them." On being shown the casks this witness pointed out where the leak occurred, and in my judgment, the true cause of it. The leak was in the chine, and at that end of each cask there appears to have been a pressure at right angles with the length of the cask and parallel to the direction of the head and with the staves of the head. This pressure is apparent from the present shape of that end of the empty barrel, as one of the staves of the head is drawn endwise from its place at least ¼ of an inch. This is manifest from the position of the brand, "M & V., Portland," which I suppose was put on the casks just before they were shipped. The "M" is upon one stave and the "V" upon another. The character "&" is between these letters and was made partly upon one stave and party upon the other. Now one stave is pushed by the other, so that the corresponding parts of the character do not meet by at least ¼ of an inch. So with the word "Portland." It extends from one stave across on to the other, but now the letters do not meet by about the same distance. The shifting of the staves of the head of this cask caused the loss of the wine. Of this there can be no little doubt. What caused the shifting of the staves, and whether the head was of proper material and workmanship to support the ordinary handling and pressure of such a voyage, may admit of difference of opinion. The respondents have not shown that there was any secret defect or insufficiency about the cask to cause this leak. By their receipt they acknowledged that the cask was in good order when they received it. This is no ordinary leakage or evaporation such as liquor casks are subject to, but substantially a total loss from an injury to the cask after delivery to the vessel. Unless, then, the respondents show that this injury or slipping of the stave in the head was the necessary or probable result of the insufficiency of the workmanship or material of the cask or some part of it, the libellants are entitled to recover. No such proof has been made. What has been said of the empty cask applies also to the other one. The injury to it is not near so apparent, but of the same character. The leak is in the chine, and one of the staves of the head has slipped by the other a little. The probability is, that in slinging these casks into the hold, they got jammed, or that after being stowed they were subjected to a pressure from above and near the end, which started the staves in the head as has been described. As to the value of the wine, the only testimony upon that point is that of the libellant, Van Schuyver. He says that the wine, including freight and primage, cost $217 in currency. There must be a decree for the libellants for the value of the goods—$217—with legal interest since November 8, 1867, and for costs of suit.